## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| MELCHIOR A. GEORGE | ) | |
| 1318 Galloway Street, N.E. | ) | |
| Washington, D.C.  20017 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MOLSON COORS BEVERAGE | ) | |
| COMPANY USA, LLC | ) | Civil Action No. _____ |
| 250 S. Wacker Drive, Suite 800 | ) | |
| Chicago, Illinois  60606 | ) | |
| | ) | |
| Serve:  Incorporating Services Ltd. | ) | |
| 1100 H Street, N.W., Suite 840 | ) | |
| Washington, D.C. 20005 | ) | |
| Registered Agent | ) | |
| | ) | |
| Defendant. | ) | |

_____)

## COMPLAINT

MELCHIOR A. GEORGE, by counsel, hereby moves this Court for Judgment in his favor, and against the Defendant MOLSON COORS BEVERAGE COMPANY USA, LLC, and in support thereof, states as follows:

## NATURE OF ACTION

1.      This is a civil action alleging discrimination and discriminatory termination (failure to accommodate) on the basis of disability, and discrimination on the basis of race, under the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 *et seq*., and under the common law of the District of Columbia.

2.      This action also alleges interference with rights granted under the Family and
Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and retaliation in violation of the
FMLA when Plaintiff was terminated after exercising his FMLA rights.

## PARTIES

4.      Plaintiff Melchior George ("Mr. George") is a resident of District of Columbia and
at all times relevant hereto, was employed by Defendant as a National Account Executive, working
out of Washington, D.C.

5.      Defendant MolsonCoors Beverage Company USA, LLC is a foreign (Delaware)
corporation registered to do business and in good standing in the District of Columbia, and which
maintains an agent for the service of process in the District of Columbia.  MolsonCoors is
headquartered in Chicago, Illinois.[1]

6.      Defendant MolsonCoors brews, markets and distributes its various beer brands
throughout the United States (and Puerto Rico).

7.      Mr. George was an "eligible employee" of MolsonCoors within the meaning of 29
U.S.C. §2611(2)(A).

8.      MolsonCoors is an "employer" within the meaning of  29 U.S.C. §2611(4)(A) and
D.C. Code § 2-1401.02(10).

---

[1] Just prior to Mr. George's termination, in late October 2019, MillerCoors became MolsonCoors
Beverage Co. USA, LLC in connection with a restructuring.  Reference herein to "MolsonCoors"
includes its predecessor, MillerCoors.

9.      MolsonCoors is engaged in an industry affecting commerce and has had more than 50 employees for each working day in each of twenty or more calendar weeks in the current or preceding year, within the meaning of 29 U.S.C. § 2611 (4) (A).

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over Mr. George's claims pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*,  and under the D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq*.

11.      The amount in controversy in this action exceeds the jurisdictional minimum amount for this Court.

12.      Mr. George is a resident and citizen of the District of Columbia, and at all times relevant hereto, was employed by MolsonCoors and performing work on behalf of MolsonCoors in the District of Columbia.

13.      MolsonCoors is present in and conducts business in the District of Columbia and the acts complained of herein occurred in the District of Columbia.  Therefore, MolsonCoors is subject to the personal jurisdiction of this Court.

14.      The unlawful employment practices in this case were committed in the District of Columbia, and Mr. George would have continued to work for MolsonCoors from the District of Columbia but for MolsonCoors' unlawful practices.

15.      Venue is proper in this Court pursuant to 28 U.S.C. § 1331.

16.      Jurisdiction and venue are proper in this Court.

## BACKGROUND

17.     Mr. George began his employment with Miller Brewing Company in August 1991 as an Area Sales Manager.  Mr. George's career progressed steadily, both with Miller Brewing Company, and its successor (as of September 2007), MillerCoors Company (later, MolsonCoors).

18.     In November 2011, Mr. George was promoted to the position of National Account Executive in the National Accounts – Sales department, reporting to Greg Miller, who was later replaced by Jean Winter ("Ms. Winter"), who became the Team Lead for the nationwide Buffalo Wild Wings account.

19.     Mr. George was one of only two African-Americans (together with Ron Freeman) at his level within the division throughout his employment.

20.     In his position, Mr. George was responsible for all sales programming for chains on the East Cost, including the Corporate and Franchise chain groups of Buffalo Wild Wings ("BWW"). Mr. George was responsible for implementation of the division's goals and objectives; strategic planning; marketing and development of programs, merchandising methods and displays; utilization of point of sale data, demographic data, space management and household panel data; and assisting in formulating pricing strategies, conducting comprehensive analysis, evaluating sales performance, and ensuring product availability and budget compliance.

21.     During his tenure, Mr. George has been recognized for Outstanding Performance; as Top Performing Chain Account Manager (Grocery) - Mid Atlantic Region; Top Performing Chain Account Manager (Grocery) – Virginia; for Program Creation and Execution (Ahold) –

National Accounts; received national recognition for leading top performing chain sales team in the United States; was recognized for leading top performing sales team for the Mid-Atlantic Region; and was recognized for securing the largest on premise chain mandate with Chili's Tennessee.

22.     Mr. George successfully cultivated and managed the large and profitable Buffalo Wild Wings account, securing commitments for several MolsonCoors draft beer lines, and selling a "Corn Hole" program into Buffalo Wild Wings to promote the MolsonCoors brands.

23.     At all times during his employment with MolsonCoors, Mr. George performed the duties of the job for which he was contractually hired in a satisfactory and competent manner, without the need for accommodation.

24.     In February 2019, the MolsonCoors team of Jean Winter, Mr. George and Greg Miller was nominated for, and won, Vendor of the Year.

25.     Starting in or around July 2015, Mr. George began to experience periodic bouts of unexplained nausea.  While he sometimes required some sick leave to recover, he was generally back to work after a short time.

26.     In or around February 2018, Mr. George advised his then-supervisor, Greg Miller (later replaced by Jean Winter) that he was experiencing some medical issues.

27.     During the period July – September 2018, Mr. George experienced severe and debilitating nausea.  Mr. George was hospitalized at both Holy Cross Hospital and then Anne Arundel Medical Center, where the tests were inconclusive.  During this time, he continued to work, taking time off for medical appointments as necessary.  Between August and October 2018, Mr. George underwent an upper endoscopy and a colonoscopy at Anne Arundel Medical Center, and a difibulater procedure at Holy Cross Hospital.

28.     During the tests, it was discovered that Mr. George was in congestive heart failure, with his left heart ventricular was only functioning at 10-12%. He was transferred by ambulance to the Intensive Care Unit and specialists at MedStar Heart & Vascular Institute at MedStar Washington Hospital Center. After a series of tests, he was deemed an ideal candidate for a heart transplant.

29.     Mr. George was out on short term disability starting in September/October 2018.

30.     During his absence, Jean Winter, who had become team lead, stepped in to cover Mr. George's area and communicate his status to his call points of contact, and then Shanon Jansen Galati, followed by Stephanie Vint, stepped in.

31.     During his STD leave, Mr. George remained in contact with MolsonCoors as much as possible.

32.     Mr. George's 2018 Performance Review was delivered to him on February 28, 2019. In the review, Christopher R. Gick (Senior VP- On Premise Division), wrote, "You fully understand the Ethics and Compliance risks inherent to your work and/or market and know how to apply the resources available. You have completed all required ethics and compliance training and speak up when you believe something appears wrong. You build constructive relationships and demonstrate respect, cooperation and inclusion. Your consistency and trustworthiness support your credibility." It was also noted that Mr. George delivered his volume and distribution target while navigating through a significant amount of changes with the team.

33.     Nevertheless, Mr. Gick rated Mr. George lower than anticipated, given the results achieved. Mr. George was surprised by the review, since he had not received any feedback throughout the year to support many of the comments, and he received no feedback from Chris Gick

or Jean Winter following the year end evaluation.  As a result, while on leave, on March 11, 2019, Mr. George submitted a written rebuttal, stating that he had not received any actual or specific feedback in 2018 in key development areas, and he included details and examples to support his strong performance.  Mr. George asked that a deeper look be taken into his 2018 review.

34.    On March 7, 2019, Mr. George sent a email to Ms. Winter and Mr. Gick, letting them know that he would officially return to his position on May 4, 2020.  Mr. Gick responded, "we are working to select someone to cover for you while you are out.  I would like to include you in that announcement.  Hang tight until Tuesday of next week.  We will have somebody appointed by then."

35.    On March 13, 2019, Ms. Winter (BWW team lead) emailed Mr. George, stating that she and Shanon Galati (Regional Chain Account Executive residing in Ohio) would support the Buffalo Wild Wings RVPs until Mr. George's return.

36.    Mr. George was formally placed on the heart transplant list on May 16, 2019.

37.    Despite being told that the wait for a donor heart would be long – likely 80-90 days (and that he would need to remain hospitalized while awaiting a donor heart), a heart that was match quickly became available, and Mr. George's successful heart transplant procedure took place on May 23, 2019.

38.    After surgery, Mr. George spent four weeks in the hospital, during which time he underwent extensive rehabilitation and physical therapy.

39.    On June 4, 2019, Mr. Sanchez sent an email to Mr. George, pushing for his immediate return to work.  Mr. George was still in the hospital when he received the email.

40.     During a conference call later that day, Mr. Sanchez apologized for the tone of his June email pressing for Mr. George's immediate return to work, explaining that the only information he had was from MedStar, and that Reed (the third party insurance vendor) and not provided current information. (Reed had been authorized to be the point of contact for Mr. George's medical status since, in the ICU, Mr. George was not able to be contacted.)

41.     He also asked for Mr. George's thoughts on how Mr. Gick and Ms. Winters should handle his role in his absence.  Mr. Sanchez also indicated that the Year End review calibration process was closed, but he agreed to provide feedback in response to Mr. George's review rebuttal, including Mr. George's claim that Mr. Gick failed to provide feedback after multiple requests, after speaking with Chris Gick.  Mr. George never received the promised feedback.

42.     On August 19, 2019, Mr. George's treating physician at MedStar Washington Hospital Center provided formal written notification to MolsonCoors detailing Mr. George's expressed desire to return to work at MolsonCoors, and providing details of his anticipated health restrictions.  This included that while Mr. George would be able to could continue to travel by car, but would not be able to fly or ride the train until  May 2020.  This was because traveling by train or plane would expose Mr. George to significant germ carriers while he was taking immuno-suppressant drugs which reduce the strength of the body's immune system, but also are used to make the body less likely to reject a transplanted organ.

43.     During the conversation, Mr. Sanchez asked for suggestions from Mr. George regarding how Mr. Gick and Ms. Winter should handle his current role during his absence.  In response, Mr. George made it clear that he planned to return to his role, but would also be open to new roles if necessary.  They discussed the work restrictions that had been communicated from Mr.

George's doctors.  Mr. Sanchez promised to reach out to Kevin Doyle (VP) and Brian Feiro (Regional VP, and Mr. George's former supervisor and mentor) to provide formal communication regarding Mr. George's medical condition.

44.     Mr. Sanchez also stated that the Year End review process was closed, but he promised to review the situation and seek meeting with VP Chris Gick.  To Mr. George's knowledge, this never occurred.

45.     Mr. George also reiterated that Mr. Gick had refused to provide any feedback about the statements made on Mr. George's 2018 Annual Review, despite Mr. George requesting feedback on at least four separate occasions during the review meeting.

46.     Mr. George's short term disability and accrued leave expired on or around August 22, 2019, at which time he transitioned to long term disability leave, to carry him through his anticipated return date (with no restrictions) of May 4, 2020.

47.     On September 11, 2019, MolsonCoors requested that Mr. George have his physician complete a Request for Medical Information, and that Mr. George sign an Authorization for the Release of his Medical Information.  Mr. George complied with both requests.

48.     Between November 3, 2019 and December 3, 2019, Tara Jo Nellans ("Ms. Nellans"), HR Business Partner for MolsonCoors, scheduled, and cancelled, three separate meetings to discuss Mr. George's return to work plans and specific accommodations.

49.     During the meeting, Mr. Sanchez also asked for Mr. George's primary restrictions which were communicated by Mr. George's physicians:  no air travel, three hour travel/drive radius, and 10-12 hours per week driving restriction, until May 2020.

50.     On October 31, 2019, Mr. George finally met with Ms. Nellans, to discuss his request for accommodation.  During the meeting, he verbally communicated his intent to return to work as soon as possible.  Mr. George and Ms. Nellans discussed his need for certain travel accommodations until May 2020, and he provided the required documentation.  Ms. Nellans stated that MolsonCoors would review the information he had provided and word diligently to provide a job within MolsonCoors that would meet Mr. George's  need for accommodations.

51.     On November 25, 2019, MolsonCoors terminated Mr. George due to its unwillingness to provide the reasonable accommodation mandated by Mr. George' physician.  Ms. Nellans stated that no available positions existed for which he was qualified to perform "*with or without* reasonable accommodation," and that MolsonCoors would re-evaluate his "situation" if "your condition or abilities change in the future."

52.     At the time of his termination, Mr. George had worked for MolsonCoors (and its predecessors, Miller Brewing Company and MillerCoors) for over 28 years, and he was only 15 months shy of early retirement.  Mr. George was not offered any severance or bonus.

53.     In sharp contrast, MolsonCoors has a history of paying significant severance to departing Caucasian employees.  For example, Craig Bosworth (who was hired at the same time as Mr. George) and Tom Blair, both Caucasian, received severance payments when they were terminated from the company.

54.     After learning of Mr. George's medical restrictions and the reasonable accommodations required for Mr. George to return to work, MolsonCoors terminated Mr. George's employment, stating that there were no available positions for which he was qualified *with or without* accommodations.

55.     Mr. George was terminated on November 25, 2019, after Ms. Nellans stated that no available positions existed for which he was qualified to perform "*with or without* reasonable accommodation," and that MolsonCoors would re-evaluate his "situation" if "your condition or abilities change in the future."

56.     However, MolsonCoors filled an open position in or around the September/October 2019 time frame for which Mr. George was qualified (replacing Reilly Madison), which would have accommodated his travel restrictions.

57.     Mr. George was, and is, capable of performing the functions of the job for which he was hired.  Even with his current limitations, the use of technology allows him to perform at a high level to maintain connectivity with key Buffalo Wild Wing stakeholders.  By May 2020, the accommodations required by Mr. George would basically be eliminated.

58.     In addition, Mr. George was not considered for any Distributor Sales Manager Jobs in the D.C.-Maryland-Virginia ("DMV") area, for which he was qualified, and which would have accommodated his travel restrictions.  Mr. George's role as National Account Executive had required him to work with those positions closely, and he was extremely familiar with each position within the geographic area in the DMV, including the Baltimore area.

59.     Mr. George, who had been one of only two African-Americans (together with Ron Freeman) at his level within the On-Premise division throughout his employment, and at the time of his termination, was replaced by a Caucasian employee.

60.     Mr. George's replacement is Caucasian (Stephanie Vint).

61.     MolsonCoors took these actions despite the fact that in 1975, MolsonCoors (its predecessor company) entered into a large settlement with the EEOC arising from claims of race

11

discrimination, and MolsonCoors was supposed alter its practices to become less discriminatory as part of that agreement.  However, throughout Mr. George's tenure, the Company retained the composition of its non-diverse work force.

**COUNT ONE –**
**DISCRIMINATION BASED ON DISABILITY IN THE COURSE OF EMPLOYMENT**
**IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**

62.     The allegations of the foregoing paragraphs are incorporated as if re-alleged herein.

63.     MolsonCoors discriminated against Mr. George on account of his disability and because he asked that MolsonCoors provide reasonable accommodation, as mandated by his physician, in order to allow him to return to work.  MolsonCoors furthered its discrimination by refusing to accommodate Mr. George by allowing him to return to work pursuant to the terms of the written recommendations for accommodations by his treating physician.

64.     Such discrimination was with respect to the terms, conditions, and privileges of Mr. George's employment at MolsonCoors, in violation of D.C. Code § 2-1402.11.

65.     After learning of Mr. George's medical restrictions and the reasonable accommodations required for Mr. George to return to work, MolsonCoors terminated Mr. George's employment, stating that there were no available positions for which he was qualified *with or without* accommodations.

66.     However, MolsonCoors filled an open position in or around the September/October 2019 time frame for which Mr. George was qualified (replacing Reilly Madison), which would have accommodated his travel restrictions.

67.     In addition, Mr. George was not considered for any Distributor Sales Manager Jobs in the D.C.-Maryland-Virginia ("DMV") area, for which he was qualified, and which would have accommodated his travel restrictions.  Mr. George's role as National Account Executive had required him to work with those positions closely, and he was extremely familiar with each position within the geographic area in the DMV, including the Baltimore area.

68.     MolsonCoors engaged in the conduct set forth above and throughout this Complaint, in violation of D.C. Code §§ 2-1402.11, 2-1402.62 and 2-1402.68.

69.     Mr. George was terminated as a result of the discriminatory treatment he suffered.

70.     This discrimination involved and affected the terms, conditions, and privileges of Mr. George's employment at MolsonCoors in violation of D.C. Code § 2-1402.11.

71.     MolsonCoors' actions had the effect and consequence of violating the provisions of the D.C. Human Rights Act, D.C. Code § 2-1401.1, *et seq.*, in violation of D.C. Code § 2-1402.68.

72.     MolsonCoors' discriminatory actions were intentional, were actuated by malice, spite, and ill-will, were willful and wanton, and evinced a conscious and reckless disregard for Mr. George's rights.

73.     As a direct and proximate result of MolsonCoors' conduct, Mr. George has suffered, and will in the future suffer, great damage including loss of past and future income, loss of employee benefits, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, medical expenses, physical impact, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

74.     As a direct and proximate result of MolsonCoors' discrimination, Mr. George is entitled to recover damages pursuant to D.C. Code § 2-1403.16, as described in D.C. Code §2-1403.13 and the Code of D.C. Municipal Regulations, Title 4, Chapter 2, 4-200 CDCR, *et seq*.

75.     Due to the character and severity of MolsonCoors' actions, and consistent with the intentional discrimination by MolsonCoors, Mr. George is also entitled to punitive damages.

## COUNT TWO –
## DISCRIMINATION BASED ON RACE
## IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT

76.     The allegations of the foregoing paragraphs are incorporated as if re-alleged herein.

77.     Mr. George was one of only two African-Americans (with Ron Freeman) at his level in the division throughout his employment, and at the time of his termination.  Mr. George was replaced by a Caucasian employee, Stephanie Vint.

78.     In addition, MolsonCoors has a history of paying significant severance to departing Caucasian employees.  For example, Craig Bosworth, VP of Kroger (who was hired at the same time as Mr. George) and Tom Blair, VP of 7-11, both Caucasian, were given severance payments when they were terminated from the company.  Despite this, Mr. George was not offered any severance.

79.     MolsonCoors took these actions despite the fact that in 1975, MolsonCoors (its predecessor company) entered into a large settlement with the EEOC arising from claims of race discrimination, and MolsonCoors was supposed alter its practices to become less discriminatory as part of that agreement.  However, throughout Mr. George's tenure, the Company retained the composition of its non-diverse work force.

80.     MolsonCoors filled an open position in or around the September/October 2019 time frame for which Mr. George was qualified (replacing Reilly Madison) but not considered, and he was not considered for any Distributor Sales Manager Jobs n the D.C.-Maryland-Virginia ("DMV") area, for which he was qualified.

81.     Such discrimination was with respect to the terms, conditions, and privileges of Mr. George's employment at MolsonCoors, in violation of D.C. Code § 2-1402.11.

82.     MolsonCoors engaged in the conduct set forth above and throughout this Complaint, in violation of D.C. Code §§ 2-1402.11, 2-1402.62 and 2-1402.68.

83.     Mr. George was terminated as a result of the discriminatory treatment he suffered.

84.     This discrimination involved and affected the terms, conditions, and privileges of Mr. George's employment at MolsonCoors in violation of D.C. Code § 2-1402.11.

85.     MolsonCoors' actions had the effect and consequence of violating the provisions of the D.C. Human Rights Act, D.C. Code § 2-1401.1, *et seq*., in violation of D.C. Code § 2-1402.68.

86.     MolsonCoors' discriminatory actions were intentional, were actuated by malice, spite, and ill-will, were willful and wanton, and evinced a conscious and reckless disregard for Mr. George's rights.

87.     As a direct and proximate result of MolsonCoors' conduct, Mr. George has suffered, and will in the future suffer, great damage including loss of past and future income, loss of employee benefits, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, medical expenses, physical impact, embarrassment,

humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

88.     As a direct and proximate result of MolsonCoors' discrimination, Mr. George is entitled to recover damages pursuant to D.C. Code § 2-1403.16, as described in D.C. Code §2-1403.13 and the Code of D.C. Municipal Regulations, Title 4, Chapter 2, 4-200 CDCR, *et seq*.

89.     Due to the character and severity of MolsonCoors' actions, and consistent with the intentional discrimination by MolsonCoors, Mr. George is also entitled to punitive damages.

**COUNT THREE –**
**INTERFERENCE WITH RIGHTS GRANTED**
**BY THE FAMILY AND MEDICAL LEAVE ACT**

90.     The allegations of each of the preceding paragraphs are incorporated herein as if specifically realleged.

91.     Mr. George underwent a successful heart transplant procedure on May 23, 2019.

92.     After surgery, Mr. George spent four weeks in the hospital, during which time he underwent extensive rehabilitation and physical therapy.

93.     Defendant knew, or should have known, that Mr. George kept fully abreast of his job duties while on medical leave as he communicated with his supervisors frequently during his hospitalization and recovery, so there would be no lag time to get up to speed upon his return to work.

94.     Mr. George made it clear that he planned to return to his role.

95.     On November 25, 2019, MolsonCoors terminated Mr. George because he exercised his right to take medical leave consistent with Defendant's policies, and consistent with the FMLA,

and because of their perception that Mr. George would take additional leave under the FMLA in the future.

96.     At the time of his termination, Mr. George had worked from MolsonCoors (and its predecessors, Miller Brewing Company and MillerCoors) for over 28 years, and he was only 15 months shy of early retirement.  Mr. George was not offered any severance or bonus.

97.     MolsonCoors engaged in these practices with malice and with reckless indifference to the federally protected rights of Mr. George, within the meaning of 29 U.S.C. § 2617, for which Mr. George is entitled equitable relief, including employment and reinstatement.

98.     As a direct and proximate result of MolsonCoors' conduct, Mr. George has suffered, and will in the future suffer, great damage including loss of past and future income, loss of employee benefits, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, medical expenses, physical impact, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

99.     Due to the severity of the conduct, Mr. George is entitled to liquidated damages.

**COUNT FOUR -**
**RETALIATION IN VIOLATION OF**
**THE FAMILY AND MEDICAL LEAVE ACT**

100.     The allegations of each of the preceding paragraphs are incorporated herein as if specifically realleged.

101.     MolsonCoors retaliated against Mr. George  by engaging in an course of conduct designed to prevent Mr. George from returning to work after taking leave pursuant to

MolsonCoors' policies, and consistent with the FMLA, and after he had communicated to MolsonCoors his intent and desire to return, and his anticipated return to work date.

102.   Mr. George underwent a successful heart transplant procedure on May 23, 2019.

103.   After surgery, Mr. George spent four weeks in the hospital, during which time he underwent extensive rehabilitation and physical therapy.

104.   On June 4, 2019, Mr. Sanchez sent an email to Mr. George, pushing for his immediate return to work.  Mr. George was still in the hospital when he received the email.

105.   On August 19, 2019, Mr. George's treating physician at MedStar Washington Hospital Center provided formal written notification to MolsonCoors detailing Mr. George's expressed desire to return to work at MolsonCoors, and providing details of his anticipated health restrictions.

106.   Defendant knew, or should have known, that Mr. George kept fully abreast of his job duties while on medical leave as he communicated with his supervisors frequently during his hospitalization and recovery, so there would be no lag time to get up to speed upon his return to work.

107.   Mr. George made it clear that he planned to return to his role.

108.   On September 11, 2019, MolsonCoors requested that Mr. George have his physician complete a Request for Medical Information, and that Mr. George sign an Authorization for the Release of his Medical Information.  Mr. George complied with both requests.

109.   Between November 3, 2019 and December 3, 2019, Tara Jo Nellans ("Ms. Nellans"), HR Business Partner for MolsonCoors, scheduled, and cancelled, three separate meetings to discuss Mr. George's return to work plans and specific accommodations.

110.     During the meeting, Mr. Sanchez also asked for Mr. George's primary restrictions which were communicated by Mr. George's physicians:  no air travel, three hour travel/drive radius, and 10-12 hours per week driving restriction, until May 2020.

111.     On October 31, 2019, Mr. George finally met with Ms. Nellans, to discuss his return to work.  Mr. George communicated that he would be free of all medical restrictions as of May 2020, and he provided the required documentation.

112.     MolsonCoors retaliated against Mr. George for taking leave consistent with MolsonCoors' policies, and with the FMLA, when they insisted he return to work quickly and then treated him differently going forward, and then, ultimately terminated his employment despite his stated intent to return to his role, and the related ongoing communications.

113.     At the time of his termination, Mr. George had worked from MolsonCoors (and its predecessor, Miller Brewing Company) for over 28 years, and he was only 15 months shy of early retirement.  Mr. George was not offered any severance or bonus.

114.     MolsonCoors' retaliatory conduct evidences malice, spite, and ill will; their actions are willful and wanton; and evince a conscious disregard for the rights of Mr. George.

115.     MolsonCoors engaged in these practices with malice and with reckless indifference to the federally protected rights of Mr. George, within the meaning of 29 U.S.C. § 2617, for which Mr. George is entitled equitable relief, including employment and reinstatement.

116.     As a direct and proximate result of MolsonCoors' conduct, Mr. George has suffered, and will in the future suffer, great damage including loss of past and future income, loss of employee benefits, loss of career and business opportunities and advancement, past pecuniary

expenses, future pecuniary expenses, medical expenses, physical impact, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

117.   Due to the severity of the conduct, Mr. George is entitled to liquidated damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Melchior A. George requests this Court enter judgment in his favor, and against Defendant MOLSON COORS BEVERAGE COMPANY USA, LLC, on the above counts, and further:

(a)   Award Mr. George compensatory damages of $5,000,000.00 (Five Million Dollars); and in addition

(b)   Award Mr. George punitive and exemplary damages, in an amount to be determined by a jury, on the above-stated Counts One and Two; and in addition

(c)   Award Mr. George liquidated damages on the above-stated Counts Three and Four;

(d)   Award Mr. George reasonable attorneys' fees and the costs of this action, including expert witness fees; and in addition

(e)   Declare that the Defendant has violated the District of Columbia Human Rights Act; and in addition

(f)   Enjoin the Defendant from further violations of the District of Columbia Human Rights Act; and in addition,

(g)   Award Mr. George such other and further relief as may be appropriate under the circumstances.

## <u>JURY DEMAND</u>

**PLAINTIFF MELCHIOR A. GEORGE DEMANDS A TRIAL BY JURY.**

July 15, 2020                                  Respectfully submitted,

*/S/ CARLA D. BROWN*
Carla D. Brown
cbrown@cbcblaw.com
D.C. Bar No. 474097
CHARLSON BREDEHOFT
  COHEN & BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, VA  20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
*Counsel for Plaintiff Melchior A. George*