## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MELCHIOR A. GEORGE**, <br><br> Plaintiff, <br><br> v. <br><br> **MOLSON COORS BEVERAGE COMPANY USA, LLC**, <br><br> Defendant. | Case No. 1:20-cv-01914 (TNM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Melchior George is a former employee of Molson Coors Beverage Co. USA, LLC. While employed, he experienced health issues and eventually received a heart transplant. He showed interest in returning to work, with accommodations, but Molson Coors terminated him. George brings claims of disability and race discrimination under the D.C. Human Rights Act ("DCHRA") and claims of interference and retaliation under the Family and Medical Leave Act ("FMLA"). Molson Coors moves to dismiss all counts except the claim for disability discrimination. The Court will grant the motion but will allow George to amend his Complaint.

### I.

George started working for Molson Coors in 1991 as an Area Sales Manager. Compl. ¶ 17, ECF No. 1. Twenty years later, he was promoted to the position of National Account Executive. *Id.* ¶ 18. He was one of two African Americans "at his level" in his division. *Id.* ¶ 19. As a National Account Executive, he was responsible for all sales programming for chains on the East Coast, including the Buffalo Wild Wings chain. *Id.* ¶ 20. His team received several performance awards. *Id.* ¶¶ 21, 24.

Starting around July 2015, George began to experience "periodic bouts of unexplained nausea." *Id.* ¶ 25.  He used sick leave to recover, but he was never out of work for long until 2018.  *Id.* ¶¶ 25, 27, 29.  Between July and September of that year, he experienced "severe and debilitating nausea," leading to his hospitalization.  *Id.* ¶ 27.  Medical tests revealed that he had congestive heart failure and additional tests found him an ideal candidate for a heart transplant. *Id.* ¶ 28.  In the wake of these events, George was "out on short term disability [leave] starting in September/October 2018."  *Id.* ¶ 29.  He remained in touch with his supervisors and told them that he intended to return in May 2020.  *Id.* ¶¶ 31, 34.

In late February 2019, George received his 2018 performance review from Christopher Gick, a Senior Vice President.  *Id.* ¶ 32.  The written feedback was positive, but George viewed his rating as "lower than anticipated."  *Id.* ¶ 33.  George submitted a "written rebuttal" and asked Gick to take another look at his performance.  *Id.* ¶¶ 33, 41, 45.  Another supervisor, a "Mr. Sanchez," promised to respond to George's rebuttal, but he never did.  *Id.* ¶¶ 41, 44–45.

George received a successful heart transplant on May 23, 2019.  *Id.* ¶ 37.  After the surgery, he spent four weeks in the hospital, undergoing "extensive rehabilitation and physical therapy."  *Id.* ¶ 38.  On June 4, Sanchez sent George an email "pushing for his immediate return to work."  *Id.* ¶ 39.  Later that day, Sanchez "apologized for the tone" of his email and asked for George's thoughts on how other employees should handle his role in his absence.  *Id.* ¶¶ 40–41, 43.  George "made it clear that he planned to return to his role, but would also be open to new roles if necessary."  *Id.* ¶ 43.

According to George, his "short term disability and accrued leave expired on or around August 22, 2019, at which time he transitioned to long term disability leave, to carry him through his anticipated return date (with no restrictions) of May 4, 2020."  *Id.* ¶ 46.  That month, his

physician provided "formal written notification" to Molson Coors of George's desire to return to work and his anticipated health restrictions. *Id.* ¶ 42.  The anticipated restrictions were "no air travel, [a] three-hour travel/drive radius, and [a] 10-12 hours per week driving restriction, until May 2020." *Id.* ¶ 49.

In late October, George met with Tara Jo Nellans, a human resources employee, to discuss his restrictions. *Id.* ¶¶ 48, 50.  George "provided the required documentation" and Nellans said that Molson Coors would work "diligently" to provide a job "that would meet [George's] need for accommodations." *Id.* ¶ 50.

Over the next two months, Nellans "scheduled, and cancelled, three separate meetings to discuss [George's] return to work plans and specific accommodations." *Id.* ¶ 48.  And then in late November, Molson Coors terminated George's employment. *Id.* ¶ 51.  Nellans allegedly told George that no available positions existed for which he was qualified, but the company would "re-evaluate" his situation if his "condition or abilities change in the future." *Id.*

Yet, George alleges, Molson Coors filled an open position that autumn for which he was qualified and that would have accommodated his travel restrictions. *Id.* ¶ 56.  And he was "not considered" for other such jobs. *Id.* ¶ 58.

George was replaced by a Caucasian employee. *Id.* ¶¶ 59–60.  He was also "not offered any severance or bonus" upon termination. *Id.* ¶ 52.  Two Caucasian employees—Craig Bosworth ("VP of Kroger") and Tom Blair ("VP of 7-11")—allegedly received severance payments when they were terminated from Molson Coors. *Id.* ¶¶ 53, 78.  George further alleges that in 1975, Molson Coors's predecessor company "entered into a large settlement with the [Equal Employment Opportunity Commission ("EEOC")] arising from claims of race discrimination." *Id.* ¶ 61.  Even though the company "was supposed [to] alter its practices to

become less discriminatory," it "retained the composition of its non-diverse work force" throughout George's employment. *Id.*

George brings four claims: (1) disability discrimination under the DCHRA (Count I); (2) race discrimination under the DCHRA (Count II); (3) FMLA interference (Count III); and (4) FMLA retaliation (Count IV). *Id.* ¶¶ 62–117.[1]  Molson Coors moves to dismiss Counts II, III, and IV for failure to state a claim.  Def.'s Mot. at 1,[2] ECF No. 6; *see* Fed. R. Civ. P. 12(b)(6). This motion is ripe for disposition.

## II.

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To meet this standard, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Court must "treat the complaint's factual allegations as true and must grant the plaintiff[] the benefit of all inferences that can be derived from the facts alleged." *L. Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017) (cleaned up).  But the Court need not credit legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.  And while a complaint need not contain "detailed factual allegations," it must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*  The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  Assessing plausibility is

---

[1]  The Court has federal question jurisdiction over the FMLA claims, 28 U.S.C. § 1331, and it has supplemental jurisdiction over the DCHRA claims, *id*. § 1367(a).

[2]  All page citations refer to the page numbers that the CM/ECF system generates.

ultimately a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### III.

### A.

Molson Coors argues that George's Complaint does not state a plausible claim of race discrimination under the DCHRA. Def.'s Mem. at 2–4, ECF No. 6-1. The Court agrees.

The DCHRA makes it unlawful for employers to discriminate against employees based on race. D.C. Code § 2-1402.11(a)(1)(A). In analyzing this prohibition, the D.C. Court of Appeals generally looks to decisions of federal courts in Title VII cases. *See Daka, Inc. v. Breiner*, 711 A.2d 86, 94 (D.C. 1998).

In the Title VII context, a plaintiff need not offer "specific facts establishing a prima facie case of discrimination." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002). But the plaintiff still must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. And the core of a discrimination claim is that the plaintiff suffered an adverse action because of a protected characteristic. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). Indeed, in applying the *Twombly* and *Iqbal* pleading standard to discrimination claims under the DCHRA (including race discrimination), the D.C. Court of Appeals has asked whether the plaintiff "sufficiently pled a nexus between the adverse employment actions and the alleged discriminatory motives." *Poola v. Howard Univ.*, 147 A.3d 267, 280 (D.C. 2016).

George's Complaint fails this test. He alleges unfavorable treatment that manifested itself in several ways—an "inexplicably low" rating on his 2018 performance review, never receiving feedback on his performance review despite repeated requests, his ultimate

termination, not receiving severance, and the company's failure to consider him for positions that he was qualified to perform and that would have accommodated his restrictions. Pl.'s Opp'n at 5, ECF No. 7. In seeking to tie this unfavorable treatment to his race, George makes only a handful of allegations. Even when considered collectively, these allegations fail to state a plausible case.

George first alleges that he was replaced by a Caucasian employee. Compl. ¶¶ 59–60. But unsurprisingly, that alone is not enough to get past the pleading stage. *See McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 586 (4th Cir. 2015). This sort of allegation may be "*consistent* with discrimination," but "it does not alone support a *reasonable inference* that the decisionmakers were motivated by bias." *Id.* It "stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up).

George mainly relies on an allegation that two Caucasian employees received a severance payment upon their termination from Molson Coors, while he did not. Compl. ¶¶ 53, 78; *see* Pl.'s Opp'n at 5. He posits that these were "similarly-situated" employees treated more favorably. Pl.'s Opp'n at 5. And he claims to have "specifically alleged [that] one of the Caucasian employee comparators was of equal seniority to himself." *Id.*

But George's Complaint tells another story. One of these employees, Craig Bosworth, "was hired at the same time as [George]." Compl. ¶ 53. An allegation that two employees were "hired at the same time" is surely *not* an allegation that they were "of equal seniority." And the Complaint elsewhere describes Bosworth and the other employee, Tom Blair, as Vice Presidents of "Kroger" and "7-11," respectively. *See id.* ¶ 78. George was a National Account Executive. *Id.* ¶ 18. So his proposed comparators had different jobs in different companies. George's own allegations contradict any notion that he was similarly situated to the two Caucasian employees

who received a severance payment.  *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) ("To prove that he is similarly situated to another employee, a plaintiff must . . . demonstrate that all of the relevant aspects of his employment situation were nearly identical to those of the other employee." (cleaned up)).

In defending the sufficiency of his allegations, George cites *McNair v. District of Columbia*, 213 F. Supp. 3d 81 (D.D.C. 2016), and *Poola*, 147 A.3d 267.  *See* Pl.'s Opp'n at 5–6. But as Molson Coors rightly points out, *see* Def.'s Reply at 4 n.1, ECF No. 8, the pleadings in those cases had more substance.  In *McNair*, the plaintiff alleged that she, an administrative law judge, was not allowed to work from home even though *other administrative law judges* of a different race were allowed.  *See* 213 F. Supp. 3d at 87.  And in *Poola*, there was considerable detail about how male, African-American administrators treated the plaintiff and other female, non-African-American professors less favorably than their male, African-American counterparts, including examples of belittlement and harassment.  *See* 147 A.3d at 273–74, 278–79.  *McNair* and *Poola* are a far cry from this case, in which George's Complaint itself negates any inference that he was similarly situated to the alleged comparators.

George's Complaint contains two other race-based allegations, but neither suggests that race had anything to do with the unfavorable treatment *he* received.  George claims he was "one of only two African-Americans (together with Ron Freeman) at his level within the division throughout his employment."  Compl. ¶ 19.  At worst, this allegation undermines an inference of race discrimination and at best, it tells us nothing.  George nowhere alleges that Molson Coors took adverse action against Freeman, and the company took no adverse action against George until 2019.  Indeed, he was an award-winning team member.  *Id.* ¶¶ 21, 24.  George became a National Account Executive in 2011, so there were two African Americans "at his level" for

eight years with no adverse action taken against them.  *Id.* ¶¶ 18–19.  Thus, for a long while, Molson Coors accepted having two African Americans in George's division, indicating that something other than race motivated the eventual adverse action against George.  More, he does not say how many total employees were "at his level within the division."  *Id.* ¶ 19.  If, for example, there were three total, then African-American employees were in the majority.  In short, this allegation is not even "consistent with" discrimination, much less does it help support a plausible inference of racial bias.  *See Iqbal*, 556 U.S. at 678.

Finally, George alleges that Molson Coors's predecessor company "entered into a large settlement with the EEOC arising from claims of race discrimination."  Compl. ¶ 61.  And even though Molson Coors "was supposed [to] alter its practices to become less discriminatory as part of that agreement," the company "retained the composition of its non-diverse work force" throughout George's employment.  *Id.*  But George does not explain why these general background allegations raise an inference that *he* suffered from race discrimination.  *See* Pl.'s Opp'n at 4–7; *Williams v. Boorstin*, 663 F.2d 109, 115 n.38 (D.C. Cir. 1980) ("This [Title VII] suit is not a class action.  Consequently, in this case, evidence of systematic or general instances of discrimination can only be collateral to evidence of specific discrimination against the actual plaintiff." (citation omitted)).  Indeed, he does not even mention these allegations in his opposition brief.  *See* Pl.'s Opp'n at 4–7.

Because the Complaint's allegations—even taken collectively—fail to state a plausible claim of race discrimination under the DCHRA, the Court will dismiss Count II.

## B.

Molson Coors next contends that George's Complaint does not state a plausible claim of interference or retaliation under the FMLA.  Def.'s Mem. at 4–7.  The Court again agrees.

Under the FMLA, it is unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  It is also unlawful "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *Id.* § 2615(a)(2).  Courts generally recognize an "FMLA interference" claim under § 2615(a)(1) and an "FMLA retaliation" claim under § 2615(a)(2).  *See Gordon v. U.S. Capitol Police*, 778 F.3d 158, 160–61 (D.C. Cir. 2015).

### 1.

Start with interference.  To succeed on this claim, a plaintiff need not show that his employer denied requested leave.  *Id.* at 164.  Rather, "an employer action with a reasonable tendency to 'interfere with, restrain, or deny' the 'exercise of or attempt to exercise' an FMLA right may give rise to a valid interference claim . . . even where the action fails to actually prevent such exercise or attempt."  *Id.* at 165.

The main problem with George's interference claim, as currently pleaded and argued, is that he never says *when* he was on FMLA leave.  He advances four theories of interference, but they all rely on one of two premises: either that George *was on FMLA leave* when Molson Coors took interfering action or that *his FMLA leave had just ended* when Molson Coors took interfering action.  *See* Pl.'s Opp'n at 7–8.  With no coherent allegations about when George was on FMLA leave, these theories of interference lack any substance and cannot proceed.

His first two theories stem from the same basic events.  George alleges that in June 2019, soon after he underwent his surgery and while still hospitalized, Sanchez contacted him without authorization.  Compl. ¶ 40.  When Sanchez reached out, he allegedly "push[ed] for [George's] immediate return to work."  *Id.* ¶ 39.  He also asked for George's thoughts on how other

employees should handle his role during his absence. *Id.* ¶ 41. For his first theory of interference, George suggests, without invoking any caselaw, that Molson Coors interfered with his FMLA rights because Sanchez contacted him without authorization *while he was on FMLA leave*. *See* Pl.'s Opp'n at 7–8. For his second theory, George argues, again without citation to authority, that Molson Coors interfered with his FMLA rights because Sanchez asked him to perform substantive work *while he was on FMLA leave*. *See id.* at 8.

But when was George on FMLA leave? Even granting him "the benefit of all inferences that can be derived from the facts alleged," as the Court must, *L. Xia*, 865 F.3d at 649, there is no basis to infer that George was on FMLA leave in June 2019, when Sanchez contacted him. Perplexingly, George nowhere alleges in his Complaint (or even his opposition brief) when he was on FMLA leave. *See Greer v. Bd. of Trs. of Univ. of D.C.*, 113 F. Supp. 3d 297, 311 (D.D.C. 2015) ("[T]he unavailability of details does not excuse Plaintiff from alleging, on information and belief if necessary, the general sequence of events and basic facts."). He at times refers to periods of "leave," but he nowhere alleges that these were periods of *FMLA* leave. *See* Compl. ¶¶ 29, 31, 33, 46.

And if anything, George's own allegations suggest he was *not* on FMLA leave in June 2019. The earliest period of leave that George mentions is the "short term disability [leave] starting in September/October 2018," which began after he was diagnosed with congestive heart failure. *Id.* ¶¶ 27–29. As Molson Coors points out, *see* Def.'s Reply at 6 n.3, FMLA leave generally begins to run from the time that an employee becomes disabled. *See* 29 U.S.C. § 2612(a)(1)(D); *Sampson v. Citibank, F.S.B.*, 53 F. Supp. 2d 13, 18 (D.D.C. 1999), *aff'd*, 221 F.3d 196 (D.C. Cir. 2000). And the cap on FMLA leave is clear: employees are "entitled to a total of 12 workweeks of leave during any 12-month period." 29 U.S.C. § 2612(a)(1). So if we

10

assume that George's FMLA leave began on October 31, 2018, it would have expired on January 23, 2019, with George unable to take off another 12 weeks at least until October 31, 2019 (the beginning of the next 12-month period).[3]  So, unless George clarifies the timeline of events, he could not have been on FMLA leave in June 2019, when Sanchez contacted him.

The same problem exists for George's other two theories of interference.  He notes that an employee is "entitled, on return from [FMLA] leave . . . to be restored by the employer to the position of employment held by the employee when the leave commenced . . . or . . . to be restored to an equivalent position."  *Id.* § 2614(a)(1)(A)–(B); *see* Pl.'s Opp'n at 7.  So he claims that Molson Coors interfered with his FMLA rights when it denied him "the right to return to an equivalent position at the end of his FMLA leave."  Pl.'s Opp'n at 8.  He specifically observes that Molson Coors "took no action to return [him] to the workplace for *four months* before terminating him."  *Id.* (emphasis added).  As he was terminated on November 25, 2019, *see* Compl. ¶ 51, the alleged interfering conduct here started in late July 2019, six months *after* George's presumed initial period of FMLA leave would have expired in January 2019.

Since George's theory is that Molson Coors failed to restore him to work "at the end of his FMLA leave," Pl.'s Opp'n at 8, there is a fatal discrepancy here.  And indeed, another judge in this District has reasoned that once an FMLA period is "exhausted," the employer "is not required to hold the employee's job for [his] eventual return."  *Alford v. Providence Hosp.*, 945 F. Supp. 2d 98, 105 (D.D.C. 2013), *aff'd*, 561 F. App'x 13 (D.C. Cir. 2014).  The FMLA "do[es] not provide a guarantee that employment will continue if the unpaid leave expires and the

---

[3]  Though neither party addresses the issue, George likely would not have been entitled to another 12 weeks of FMLA leave even after October 31, 2019.  By George's own telling, he never returned to work in 2019, but to be eligible for FMLA leave, an employee must have "been employed . . . for at least 1,250 hours of service with [his] employer during the previous 12-month period."  29 U.S.C. §§ 2611(2)(A)(ii), 2612(a)(1).

employee is still unable to return to work.  An employee who exceeds the permitted FMLA leave time has no right to be restored to his or her job."  *Id.* (cleaned up).  George provides no countervailing authority suggesting that failure to restore an employee six months after his FMLA leave expires interferes with the employee's rights under 29 U.S.C. § 2614(a)(1).  *See* Pl.'s Opp'n at 7–8.

George's final theory of interference stems from the negative performance rating he received on February 28, 2019.  *Id.* at 8; *see* Compl. ¶ 32.  In his telling, he received this rating "right as he went out on medical leave."  Pl.'s Opp'n at 8.  And he contends that "[t]he close temporal proximity between the negative review and [his] use of FMLA leave is sufficient to state a claim for FMLA interference, as employees would be discouraged from taking FMLA leave if taking leave would incur a negative performance review."  *Id.* at 8–9.  But if George's initial period of FMLA leave expired on January 23, 2019, then his February 28 rating did not come "right as he went out on medical leave."  Once again, without a coherent timeline of when George was on FMLA leave, his theory of interference is self-defeating.

To be sure, there are other problems with George's theories of interference.  For his final theory, George fails to explain how a negative performance rating—even if it comes while an employee is on FMLA leave—would have a "reasonable tendency" to interfere with the exercise of FMLA rights.  *Gordon*, 778 F.3d at 165; *see* Pl.'s Opp'n at 8–9.  If that were true, then an employer could never give an employee a negative performance review while he is on FMLA leave.  And in support of this theory, George cites *Thomas v. District of Columbia*, 227 F. Supp. 3d 88, 109 (D.D.C. 2016), but the portion of *Thomas* that George cites was discussing FMLA *retaliation*, not interference (nor was it discussing performance reviews).  *Id.* at 109–10; *see* Pl.'s Opp'n at 9.

As to George's first two theories of retaliation, Molson Coors cites authority suggesting that "minor annoyances" or other *de minimis* conduct cannot support claims for FMLA interference.  *See* Def.'s Mem. at 6 (citing *Joyce v. Office of the Architect of the Capitol*, 966 F. Supp. 2d 15, 24 (D.D.C. 2013)); Def.'s Reply at 5–6 (citing, *e.g.*, *O'Donnell v. Passport Health Commc'ns, Inc.*, 561 F. App'x 212, 218 (3d Cir. 2014)).  The Court agrees with Molson Coors that, as alleged, Sanchez's contact with George was *de minimis*.  Def.'s Mem. at 5–6.  After emailing George "pushing for his immediate return to work," Sanchez apologized the same day, explaining that he had outdated information about George's status and his lack of authorization to contact George.  Compl. ¶¶ 39–40.  He also solicited George's thoughts on how other employees "should handle his role in his absence," an eminently reasonable question.  *See Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 537 (S.D.N.Y. 2009) ("Fielding occasional calls about one's job while on leave is a professional courtesy . . . .  When limited to the scope of passing on institutional knowledge to new staff, or providing closure on completed assignments, employers do not violate the FMLA by making such calls.").

George fails to respond to Molson Coors's arguments in this regard, *see* Pl.'s Opp'n at 7–9, conceding them for now.  *See* LCvR 7(b); *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.").

For all these reasons, George has failed to state a plausible claim of FMLA interference, and the Court will dismiss Count III.

## 2.

George's FMLA retaliation claim also suffers from a timing problem.  A central element of this claim is that the employee's exercise of FMLA rights *caused* an adverse action.  *See*

*Gordon*, 778 F.3d at 161.  George's theory of retaliation is that Molson Coors gave him a negative performance review, refused to return him to work, and ultimately terminated him all because he took FMLA leave.  *See* Pl.'s Opp'n at 9.  But his only allegation in support of this connection is that these actions occurred *after* he took FMLA leave.  *See id.*  In other words, he relies solely on an allegation of temporal proximity to state his case.

When a plaintiff hangs his hat on temporal proximity alone, the exact timing matters.  A gap of three months or more is generally too long to support an inference of causation.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001).  Because George's Complaint does not say when he was on FMLA leave, it is necessarily devoid of any allegations that he suffered adverse action within three months of taking this leave.  By not even *alleging* a gap of under three months, George fails to state a plausible retaliation claim.  Simply put, an FMLA retaliation claim premised solely on timing cannot proceed when a plaintiff nowhere alleges the timing of his FMLA leave.

And if anything, George's allegations suggest that the gap was more than three months.  The clock starts when the employer knows about the employee's protected activity.  *See id.* at 273.  Here, presumably Molson Coors knew about George's protected activity—taking FMLA leave—from the moment his leave began, and there is no allegation to the contrary.  *See* Compl. ¶¶ 29–31; Pl.'s Opp'n at 9–10.  If George started his leave on October 31, 2018, *see supra* Section III.B.1, then three months later would be the end of January 2019.  Yet the earliest alleged adverse action—the negative performance review—came in late February.  Compl. ¶ 32.  And the other two alleged adverse actions—the "refusal to allow [George] to return to work in August 2019" and his termination on November 25—came much later.  Pl.'s Opp'n at 9; Compl. ¶ 51.

George thus fails to state a plausible claim of FMLA retaliation, and the Court will dismiss Count IV.

*     *     *

Molson Coors, without elaboration, asks the Court to dismiss Counts II, III, and IV with prejudice.  Def.'s Mem. at 8; Def.'s Reply at 9.  Dismissal with prejudice is warranted "only when . . . the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."  *Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012) (cleaned up).  At this early stage, the Court is not prepared to say that George cannot possibly cure the deficiencies with Counts II, III, and IV.  So the Court will dismiss them without prejudice and will allow George to file an Amended Complaint.

**IV.**

For all these reasons, it is hereby

**ORDERED** that Defendant's [6] Partial Motion to Dismiss is GRANTED.  Counts II, III, and IV of Plaintiff's [1] Complaint are DISMISSED WITHOUT PREJUDICE; and it is further

**ORDERED** that Plaintiff is granted leave to file an Amended Complaint on or before October 26, 2020.  Failure to make this filing will result in dismissal of Counts II, III, and IV of Plaintiff's [1] Complaint with prejudice.

**SO ORDERED**.

Dated:  September 24, 2020                                    TREVOR N. McFADDEN, U.S.D.J.