**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MELCHIOR A. GEORGE**, | |
| Plaintiff, | |
| v. | Case No. 1:20-cv-01914 (TNM) |
| **MOLSON COORS BEVERAGE COMPANY USA, LLC**, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Melchior George worked at Molson Coors Beverage Company as a sales executive for many years until he experienced medical problems that ended in a heart transplant. During his lengthy recovery, George could not travel farther than three hours from his home in Washington, D.C. He also refused to relocate, because of the impact on his teenage daughter. All of this posed a problem when he wished to return to work. Molson Coors determined that he could not meet his job's requirements for travel and fired him.

George sued, arguing that the company had illegally discriminated and retaliated against him both when it fired him and in one of his annual performance reviews. He also alleged that Molson Coors illegally denied him a reasonable accommodation. After discovery, Molson Coors filed for summary judgment.

The Court finds that George's travel limitations made him unqualified for his old job. And he has not shown any other Molson Coors job that was a suitable replacement. The company thus broke no law when it denied him an accommodation and failed to give him a different role. And his travel restrictions were a legitimate reason for Molson Coors's decision to fire him. Molson Coors has also proffered a legitimate reason for George's performance

review.  He challenges both reasons as pretextual, but his arguments fail.  The Court will

therefore grant Molson Coors's motion.

## I.  FACTUAL BACKGROUND

Molson Coors sells many popular domestic brands of alcoholic beverages and has done

so for over two centuries.  *See* Def.'s Stmt of Undisputed Material Facts (SUMF) ¶ 1.[1]  George

began his career with the company in 1991, and he worked there for most of the next 28 years.

*See id.* ¶ 2.  In 2011, the company promoted George to national account executive, based in

Washington, D.C., for the Buffalo Wild Wings account.  *See id.* ¶ 3.  Buffalo Wild Wings is

Molson Coors's largest customer.  *See* MSJ, Ex. 5 at 6, ECF No. 29-6 (Delaney Dep.).[2]  This job

required George to develop a sales plan of Molson Coors brands for all Buffalo Wild Wings

locations east of the Mississippi River, to facilitate that plan, and to enhance the relationship

between Molson Coors and Buffalo Wild Wings locations in George's bailiwick.  *See id.* ¶¶ 3–4.

He was one of two African American employees at this level in the entire company.  *See* Decl. of

Melchior George ¶ 4, ECF No. 32-4 (George Decl.).

Much of this case centers on how much travel George's position required.  In a job

description, Molson Coors described it as associated with "50–60% travel."  MSJ, Ex. 4 at 9,

ECF No. 29-5 (ADA Packet).  George likewise testified that travel was "a big part of the

position," *see* MSJ, Ex. 2 at 15, ECF No. 29-3 (George Dep.), and that he traveled outside the

D.C. area "40 to 50 percent of the time," *id.* at 16, usually by plane, *see id.* at 19.  During these

trips, George would meet with distributors, Buffalo Wild Wings franchise owners, and Buffalo

---

[1]  Molson Coors's Statement of Undisputed Material Facts appears in the Motion for Summary
Judgment.  *See* Mot. for Summ. J. (MSJ) at 9–26, ECF No. 29-1.  The Court cites to it by
paragraph number.

[2]  All page citations refer to the page numbers generated by the Court's CM/ECF system.

Wild Wings corporate employees.  *See id.* at 22.  He would entertain these "key stakeholders" at dinners and would give his own presentations to them about Molson Coors's products.  *See id.* at 17–18.

To be sure, some of George's contacts lived closer to Washington.  He testified that "there were significant touch points with key stakeholders" within a three-hour drive from here.  Pl.'s Opp'n to Summ. J. (Opp'n), Ex. 3 at 10, ECF No. 32-3.  He also said in passing during his deposition that he sometimes hosted stakeholders in the D.C. area.  *See id.* at 5.  In a declaration filed after the deposition, George said that he received "approximately 20–25 stakeholders per year" that way.  George Decl. ¶ 9.

In July 2018, George began to experience dizziness and "debilitating nausea."  *See* Def.'s SUMF ¶ 13.  For the most part, he worked through those issues and took "minimal" time off.  *See* George Dep. at 45–46.  But his condition worsened through the end of 2018, and he spent multiple stints in the hospital between November 2018 and February 2019.  *See* Def.'s SUMF ¶ 14.  Because of these difficulties, George took leave from work in late February 2019, as authorized by the Family and Medical Leave Act (FMLA).  *See id.* ¶ 16.

Around this time, Molson Coors gave George his 2018 performance review.  Christopher Gick was vice president of national accounts, *see* MSJ, Ex. 6 at 6, ECF No. 29-7 (Gick Dep.), and wrote the management portion of George's review.  Gick noted that George had beaten certain metrics, such as volume and distribution, but he had missed other targets, such as market share trends and a so-called innovation target.  *See* MSJ, Ex. 9, ECF No. 31 (Annual Review).  In a section entitled "How We Work," Gick wrote that some in the field had told him that George was "aloof, not visible, or not engaged."  *Id.* at 8.  Gick told George that he "[n]eed[ed] an action plan here."  *Id.*

3

Much of this feedback came from Jean Delaney.[3]  While George covered the Buffalo Wild Wings account for the eastern United States, Delaney covered the western half.  *See* Delaney Dep. at 8.  Early in 2019, Molson Coors promoted her to chain sales executive.  *See id.* at 9.  In that role, she oversaw the Buffalo Wild Wings account nationwide.  *See id.*

Delaney covered for George during his time on leave.  *See id.* at 16.  As part of that work, she interacted with many of George's contacts at Buffalo Wild Wings.  *See id.* at 11.  Some of those contacts told her that George was unresponsive and lacked "a sense of urgency."  *Id.*  Gick received feedback from others that George was "minimally present" in leading his side of the business.  Opp'n, Ex. 5 at 13, ECF No. 32-5.  Other employees provided similar feedback to Molson Coors human resources staff.  *See* Opp'n, Ex. 6 at 2, ECF No. 32-6 ("My feedback was from Nels Larsen and Matt Fenlon about Mel being aloof. . . .  That is the feedback historically with Mel . . . not new.").  George disputed this feedback, saying that Molson Coors had identified "no specific persons" who called him aloof and that he had regardless achieved "significant results."  Annual Review at 10.

Molson Coors completed the review in March 2019.  *See id.* at 11.  For 2019, the company increased George's salary by 1.5%.  *See* Def.'s SUMF ¶ 23.  He also received a bonus of $5,971.  *See id.*  That figure was apparently lower than in previous years, but George admitted that Molson Coors "had a bad year in 2018" and thus gave out lower bonuses.  *See* George Dep. at 38–39.  Delaney likewise described 2018 as "one of [the] worst years ever" for the Buffalo Wild Wings team.  Delaney Dep. at 13.

---

[3]  Previously, Delaney went by Jean Winter.  *See* MSJ at 11, n.1.  Much of the record accordingly refers to "Ms. Winter."  To avoid confusion, the Court uses her current last name here.

Sometime in early 2019, George learned that he suffered from congestive heart failure and would need a heart transplant.  *See* Def.'s SUMF ¶ 31.  He received one in May 2019.  *See id.*  That same month, George exhausted his FMLA leave.  *See id.* ¶ 34.  He remained on leave under the company's short-term disability policy.  *See id.*

In the fall, he notified Molson Coors that he wished to return to work but with certain restrictions.  George's doctors forbade him from traveling by plane or train until at least May 2020.  *See id.* ¶¶ 39, 41.  And although he could travel by car, George must remain within a three-hour radius of his D.C. hospital and could drive no more than 12 hours each week.  *See id.* ¶¶ 39–40.  More, doctors recommended that George avoid large crowds.  *See* ADA Packet at 8.  More still, he told Molson Coors that he would not relocate away from the D.C. area because his daughter was in high school here.  *See* George Dep. at 36.

Molson Coors then began the process to see if it could accommodate George's medical restrictions.  The company referred to this as "the ADA process" after the Americans with Disabilities Act.  *See* Def.'s SUMF ¶ 45.  In September 2019, Molson Coors sent George a packet of material and asked him to provide certain medical information.  *See id.* ¶ 45.  George then had a phone call with Tara Jo Nellans, an HR staffer, in early October.  *See* ADA Packet at 14.  In an email after that call, Nellans clarified the amount of travel required for George's role. *See id.*  She estimated "3–4 days a week" and a "[m]inimum of 9 days of travel via flight[s] per month."  *Id.*

Nellans and George spoke next on October 18.  During this call, Nellans explained the ADA process, the request for medical information, and what forms George would have to fill out.  *See* Def.'s SUMF ¶ 51.  Also during this call, George conveyed possible accommodations

and duties for which he felt qualified despite his medical restrictions.[4]  *See id.* ¶ 52.  He suggested that he could visit only local customers and could cover more remote customers through other technology, like Skype.  *See* ADA Packet at 19.  George also proposed the job of chain sales executive as one that he could do under his restrictions.  *See id.* at 20.

Nellans spoke with Delaney on October 22 about George's request.  They discussed George's proposed accommodations and what his role required.  *See* Def.'s SUMF ¶ 54.  That discussion included consideration of required travel to each of the territories in his region.  *See id.* ¶ 55.  Afterwards, Delaney emailed Nellans a list of the major representatives in George's area and the estimated drive time to each.  *See* ADA Packet at 21.  All were more than three hours away, and two upcoming conferences were scheduled to occur in Las Vegas.  *See id.* Delaney therefore concluded that George's travel restrictions would "prohibit him from being able to perform" his old job.  *Id.*  And based on these same points, Nellans noted on an Accommodations Checklist that George likewise could not be a chain sales executive because that role required travel beyond George's limits and attendance at conventions with large crowds.  *See id.* at 20.

Nellans and George talked again on October 31.  *See* Def.'s SUMF ¶ 60.  George said he could fulfill the role through telephone and video calls to his customers.  *See* ADA Packet at 15.  George reiterated his unwillingness to relocate because of his daughter.  *See id.* at 16.  One week later, George emailed Nellans with a list of his major customers.  *See id.* at 17.  He suggested that he could fulfill his role by meeting them during their visits to the D.C. area.  *See id.*

---

[4]  The SUMF says that George identified these accommodations during a call on October 22.  *See* Def.'s SUMF ¶ 52.  But that is the only evidence of a call between George and Nellans on that day.  Her log shows no such call.  *See* ADA Packet at 2.  Ultimately, this detail does not matter because all parties agree that during some call, George told Nellans about what duties he could perform and which roles he could fulfill.  *See* Opp'n at 13.

Nellans discussed this idea with Delaney, who said that "it was important for [ ] George to be in market and meeting with his customers in market."  MSJ, Ex. 18 at 19, ECF No. 29-19 (Nellans Dep.).  For the same reason, Delaney rejected George's suggestion that he could cover the region through phone or video calls.  *See id.* at 20.  Nellans then involved Molson Coors's ADA Committee, which consisted of staff from the company's HR, Legal, and Occupational Health groups.  *See id.* at 16.  The Committee reviewed and approved the process that Nellans had followed.  *See id.* at 21.  After that review, Nellans concluded that Molson Coors could not accommodate George's disability.  *See id.* at 22.

According to Molson Coors's policies, the company could terminate an employee once he had exhausted short-term disability benefits.  *See id.*  George had exhausted his during the back-and-forth with Nellans and was then on long-term disability.  *See* Def.'s SUMF ¶ 34.  The company formally terminated him in late November 2019 without severance pay.  *See* Def.'s MSJ, Ex. 3.  George continued to receive long-term disability benefits from the company until August 2021.  *See* Def.'s SUMF ¶ 34.

In July 2020, George sued Molson Coors, alleging violations of the D.C. Human Rights Act (DCHRA) and the FMLA.  *See* Compl., ECF No. 1.  The Court dismissed that complaint, but George filed a new one in October 2020.  *See* Am. Compl., ECF No. 12 (Compl.).  George alleged that Molson Coors had violated the DCHRA when it discriminated against him because of his disability and his race and denied him a reasonable accommodation.  *See generally id.*  George also alleged that Molson Coors had retaliated against him for using his FMLA benefits.  The Court denied Molson Coors's motion to dismiss part of that Complaint, and the parties proceeded to discovery.  *See* Order, ECF No. 16.

Molson Coors moves for summary judgment.  *See* MSJ.  George opposes.  *See* Opp'n.
The motion is now ripe for decision.[5]

## II.  LEGAL STANDARDS

Summary judgment is appropriate if "there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is
material if it "might affect the outcome of the suit under the governing law," and a dispute is
genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving
party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When evidence conflicts,
courts must "view the evidence in the light most favorable to the nonmoving party and draw all
reasonable inferences in its favor."  *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850
(D.C. Cir. 2006).

The movant bears the initial burden of identifying those portions of the record that show
the lack of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323
(1986).  Once completed, the other party must "designate specific facts showing that there is a
genuine issue for trial."  *Id.* at 324 (cleaned up).  Unsupported allegations or mere denials in the
pleadings are not enough.  *See* Fed. R. Civ. P. 56(c).  Similarly, because the nonmovant must
supply evidence that, if true, would allow a reasonable jury to find in his favor, a
"mere . . . scintilla of evidence in support of" the nonmovant's position cannot defeat a motion
for summary judgment.  *Anderson*, 477 U.S. at 252.

---

[5]  The Court has subject matter jurisdiction under 28 U.S.C. § 1331 over George's FMLA claim
and supplemental jurisdiction under 28 U.S.C. § 1367 over the DCHRA claims.

### III.  ANALYSIS

George alleges disability discrimination, race discrimination, and FMLA retaliation.  The Court takes those in turn.

### A.  George alleges that Molson Coors failed to accommodate his disability and discriminated against him because of that disability

George's disability claims come in two forms.  *First*, he argues that Molson Coors failed to reasonably accommodate his disability.  *Second*, he says that Molson Coors fired him because of that disability and therefore discriminated against him.  Although George brings these claims under the DCHRA, the Court analyzes them under applicable standards and precedents from the ADA.  *See Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015) ("When evaluating claims brought under the DCHRA, decisions construing the ADA are considered persuasive." (cleaned up)); *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583–84 (D.C. 2001) (same).

### 1.  Molson Coors did not illegally fail to provide George with a reasonable accommodation

The DCHRA and ADA prohibit employers from discriminating against a disabled individual who, "with reasonable accommodation, can perform the essential functions of the job."  *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 5 (D.C. Cir. 2010) (cleaned up).  To prevail at this stage on his failure-to-accommodate claim, George must produce evidence for a reasonable jury to conclude that (1) he was a "qualified individual" with a disability; (2) Molson Coors had notice of that disability; and (3) Molson Coors denied his request for a reasonable accommodation.  *See Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014).   As relevant here, an individual is "qualified" if he can, "with or without reasonable accommodation, [ ] perform the essential functions of the employment position that [he] holds."  *Minter v. District of Columbia*, 809 F.3d 66, 69–70 (D.C. Cir. 2015) (quoting 42 U.S.C.

§ 12111(8)).  The parties dispute whether travel beyond three hours from Washington was an essential function of George's job.

The evidence confirms that extensive travel was essential.  The job description says that the role involved 50–60% travel.  *See* ADA Packet at 9; *see also* 42 U.S.C. § 12111(8) (under the ADA a job description "shall be considered evidence of the essential functions of the job").  George himself admitted that travel was a big part of the job.  *See* George Dep. at 15.  He acknowledged this need for travel during his later discussions with Molson Coors—in an email to Nellans, he hoped to "meet [his] expected minimum 60% physical travel" once his medical restrictions eased.  ADA Packet at 17.  Based on those statements, George knew that the job required significant travel.  More, Delaney determined that because he could not meet the travel requirements, he could not perform the role.  *See id.* at 21.  The Court gives "substantial weight" to that determination by George's employer about the essential functions of his job.  *Hunt v. District of Columbia*, 66 A.3d 987, 990 (D.C. 2013) (cleaned up).

More still, this essential travel was beyond his three-hour restriction.  According to a map in the record, half the volume of Molson Coors products in George's region originated in Ohio, Michigan, and Indiana.  *See* ADA Packet at 22.  Even Mario Andretti could not reach those states within three hours from Washington.  And Delaney emailed Nellans a list of George's major customers, all of whom lived well over three hours from here.  *See id.* at 21.  It is therefore unsurprising that George, by his own admission, spent 40–50% of his time on plane trips outside the D.C. area.  *See* George Dep. at 16.

George makes several counterarguments, none of them persuasive.  He first says that a jury must determine what is an essential function.  *See* Opp'n at 24 (citing *Hancock v. Wash. Hosp. Ctr.*, 13 F. Supp. 3d 1, 5 (D.D.C. 2014)).  Despite George's citations, no rule prohibits a

court from making that determination.  In fact, the D.C. Circuit has done so since the case that

George cites.  *See Doak v. Johnson*, 798 F.3d 1096, 1105–07 (D.C. Cir. 2015).  To be sure,

determination of essential job functions is typically in the jury's province, but without a material

dispute on the matter, a court can make the requisite finding.

George's other arguments are factual.  He says that travel is not essential because among

the 28 outputs in the job description, only one "would require in-person travel to execute."

Opp'n at 25; *see also* ADA Packet at 10 ("Regional/store visits to check on execution and

opportunities").  This assertion misses the description's beginning, which declares that the job

involves 50–60% travel.  Recall too that George has admitted as much.  More, George's

contention, if true, ultimately proves little.  That only one output might be explicitly travel-

related does not make travel irrelevant to the other 27.  At the very least, he could better

accomplish the other outputs, such as "sell[ing] [a] plan to the customer" and "build[ing] rapport,

trust, and credibility" with customers, through travel.  *Id.* at 9–10.

George next argues that he could have fulfilled his role through phone and video calls to

his customers and through trips taken by other Molson Coors employees "in [his] stead."  Opp'n

at 26.  As a general matter, the Court gives "substantial weight," *Hunt*, 66 A.3d at 990, to

Delaney's conclusion that George's role "was to be customer facing, to be able to see the on-

premise facilities, [and] work directly with folks on site."  Nellans Dep. at 20.  And even without

that deference, the job description forcefully supports her judgment.  Molson Coors directed

George to "ensure that products and programs are sold to and executed in chain retailers."  ADA

Packet at 9.  That direction required George to "recreate the full experience of in-person

customer interactions[,]" something he cannot do remotely.  MSJ, Ex. 19 at 5, ECF No. 29-20.

In a final argument on this point, George says that he often fulfilled his duties by receiving customers in Washington when they visited town. *See* Opp'n at 25. He asserts that he would receive 20–25 customers a year in the D.C. area. *See* George Decl. ¶ 9. Perhaps, but that assertion fails to rebut George's own testimony that he spent almost half of his time traveling elsewhere. The time required to receive 20–25 visitors pales in comparison to George's travel time required for his job. More, that George's job required him to receive these occasional visitors does not rebut Molson Coors's assertion that the job also required extensive travel. Both things could be essential to George's job, and the record proves that extensive travel beyond Washington was essential.

In sum, George's medical restrictions prohibited him from fulfilling the essential travel functions of his role. No reasonable jury could find otherwise. He therefore was not a qualified individual. *See Minter*, 809 F.3d at 70.

George also argues that Molson Coors did not engage in an interactive process before denying his accommodation request. *See* Opp'n at 26–31. The ADA contemplates "a flexible give-and-take between employer and employee so that together they can determine" an appropriate accommodation. *Ward*, 762 F.3d at 32 (cleaned up). When an employer participates in bad faith or fails to make reasonable efforts to find an accommodation, the employer has not engaged in the interactive process. *See id.*

George's lack of qualified status ended Molson Coors's obligation to continue the interactive process. The D.C. Circuit's opinion in *Minter v. District of Columbia* is instructive. 809 F.3d 66 (2015). There, a plaintiff argued that her employer had denied her a reasonable accommodation on a particular date. *See id.* at 69. Rather than analyze the interactivity of the process, the Circuit noted that "[t]he problem with a claim based on" that date "is that [the

plaintiff] was indisputably not a 'qualified individual' as of that date." *Id.* The Circuit then affirmed summary judgment to the employer with no discussion of the interactive process. *See id.* at 70. So too here—George was not qualified for his role. Molson Coors need not continue a process that it knows will lead nowhere.

The Court will grant summary judgment to Molson Coors on George's failure-to-accommodate claim.

## 2. George has not shown that Molson Coors's explanation for firing him was pretextual

The DCHRA forbids an employer from terminating an employee based on the employee's disability. *See* D.C. Code § 2-1402.11(a). George alleges that Molson Coors fired him because his heart transplant required medical restrictions on his work. Plaintiffs like him can rely on direct or indirect evidence to show discrimination. *See Drasek v. Burwell*, 121 F. Supp. 3d 143, 160 (D.D.C. 2015).

George relies only on indirect evidence. So the familiar *McDonnell Douglas* burden-shifting framework governs. *See Giles*, 794 F.3d at 5. That framework has three parts.

First, George must establish a prima facie case of disability discrimination. He must show that (1) he has a disability; (2) he was "qualified" for the position with or without reasonable accommodation; and (3) he suffered an adverse employment action because of his disability. *See Swanks v. WMATA*, 179 F.3d 929, 933–34 (D.C. Cir. 1999). As in the failure-to-accommodate context, a plaintiff is "qualified" if he can "perform the essential functions of the employment position." *Ward*, 762 F.3d at 28 (D.C. Cir. 2014) (cleaned up).

Next, the burden shifts to the employer to produce a "legitimate, non-discriminatory reason" for its actions. *Giles*, 794 F.3d at 6. If the employer produces that evidence, the burden swings back. To survive summary judgment, the employee must show that the employer's

explanation was not its true reason and instead was pretextual. *See Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008).

That said, once the employer asserts a nondiscriminatory explanation supported by evidence, "the question whether the employee actually made out a prima facie case is no longer relevant." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (cleaned up). So a court proceeds to the ultimate question:  Whether the employee has produced enough evidence for a reasonable jury to find that the employer's explanation was not the actual basis for its actions and that discrimination was the real reason. *See id.*  "Of course, consideration of this question requires [the court] to evaluate all of the evidence before [it], including the same evidence that [George] would use to establish h[is] prima facie case." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005); *accord Harris v. Trustees of Univ. of Dist. of Colum.*, 567 F. Supp. 3d 131, 145 (D.D.C. 2021).

The Court first considers Molson Coors's explanation for George's termination—that he "could not perform the essential functions" of his role.  MSJ at 29.  Specifically, George's medical restrictions meant that he could not meet the job's travel requirements.  Recall Delaney's email to Nellans.  Many of the major customers in George's region were beyond a three-hour driving radius. *See* ADA Packet at 21.  That spelled trouble for George's ability to fulfill the requirements of the job, as Delaney noted then. *See id.*  And George's own words confirm this—he admitted during deposition that his role required extensive travel, *see* George Dep. at 15, 16, and acknowledged as much in his email to Nellans after their call on October 31, *see* ADA Packet at 17.  More, the job description included the travel requirement.

Molson Coors has thus made "an adequate evidentiary proffer" as to its justification. *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019) (cleaned up).  And Molson Coors

supports that explanation with evidence that the Court "may consider at" summary judgment, including "deposition testimony, supporting emails, and [company] records." *Id.* And the evidence supports that explanation. At the time, those who reviewed George's request relied on his inability to travel long distances to conclude that he could not perform the job.

The Court turns then to the "central inquiry": Has George "produced sufficient evidence for a reasonable jury to find that [Molson Coors's] asserted non-discriminatory reason was not the actual reason and that [Molson Coors] intentionally discriminated against [George]" because of his disability? *Adeyemi*, 525 F.3d at 1226. The Court finds that he has not.

In general, many of George's inadequate failure-to-accommodate arguments also bear on the question of pretext. For example, George's failure to perform the essential travel functions of his job mean he is not statutorily "qualified" for the role. *See Ward*, 762 F.3d at 28. That is a flaw in his prima facie case. *See Butler v. WMATA*, 275 F. Supp. 3d 70, 81–82 (D.D.C. 2017) (finding employee was not "qualified" for role that required a specific medical card because he did not have that card). To be clear, the Court does not determine now whether George stated a prima facie case. *See Brady*, 520 F.3d at 494. But to deny summary judgment, the Court must conclude that a jury could infer discrimination "from all the evidence," including the "prima facie case." *Nurriddin v. Bolden*, 818 F.3d 751, 758–59 (D.C. Cir. 2016). That evidence here shows that George was not qualified for his position.

Moving beyond his prima facie case, George argues that the record shows pretext because Molson Coors refused his suggestions to cover his region remotely or to cover a smaller region entirely. *See* Opp'n at 31. But as the Court has explained, Molson Coors rejected those accommodations for good reason. George's role required him to build rapport with Buffalo Wild Wings employees and to simulate the experience between them and retail customers. Cracking

open a cold one on Skype just isn't the same.  And his job required contact with Buffalo Wild Wings representatives well outside a three-hour travel restriction.  True, Molson Coors could have hired someone else to cover that ground, but the ADA does not require that step.  *See Floyd v. Lee*, 85 F. Supp. 3d 482, 510 (D.D.C. 2015).  In short, the denial of these accommodations stemmed from the requirements of George's role, not some discriminatory animus.

And mere denial of George's suggestions does not by itself show that Molson Coors "lied" about its reasons for firing him.  *Desmond v. Mukasey*, 530 F.3d 944, 964 (D.C. Cir. 2008).  In fact, as the Court has catalogued, the evidence shows that Molson Coors consistently identified George's failure to travel as reason for his inability to perform the role and for his eventual termination.[6]  *See Moini v. Wrighton*, __ F. Supp. 3d ___, No. 19-cv-3126, 2022 WL 1521795, at *10 (D.D.C. May 13, 2022) (finding no pretext when employer consistently noted the reason for employee's eventual termination).  That explanation has not changed.

More, Molson Coors made its decision only after George had revealed his medical restrictions.  Had the company "determined to terminate [him] regardless of whether any reasonable accommodations existed," Opp'n at 31, it would not have waited so many months into his medical leave to do so.

George next sees pretext in Molson Coors's failure to find another position for him.  This argument is tough to follow, but at a broad level George notes that Molson Coors was in the

---

[6] George argues that Delaney "did not consider" any of George's suggested alternatives.  Opp'n at 32.  That unsupported assertion contradicts deposition testimony from Nellans, who testified that Delaney considered and rejected George's idea to do phone and video calls.  *See* Nellans Dep. at 19–20.  George also faults Delaney for not responding to an email he sent in November 2019 detailing how often some of his contacts traveled to Washington.  *See* Opp'n, Ex. 15 at 2, ECF No. 32-15.  The lack of response shows nothing—Delaney had already determined that, despite the travel of his contacts, George needed "to be in market and meet[ ] with his customers in market."  Nellans Dep. at 19.  She need not respond to details of a suggestion that she had rejected.

middle of a company-wide reorganization.  *See* Opp'n at 32.  And because George had observed during his time with Molson Coors that "all jobs are open" during these reorganizations, George Dep. at 26, he says that Molson Coors's inability to identify another position for him is "highly suspect," Opp'n at 32.  At his deposition, George alleged that Molson Coors had "several distributor-related positions" and "a chain regional position or two" open at the time.  George Dep. at 26.

The record does not support George's assertion.  For one thing, he gives no support for his belief that all jobs are open during Molson Coors's reorganizations.  And in any event, the record contradicts that assertion for the jobs he identified.  Delaney affirms that, at the time, Molson Coors had no open distributor positions for which George was qualified.  *See* Decl. of Jean Delaney, Reply, Ex. 1 ¶ 13, ECF No. 35-1.  George could not identify any open distributor positions at his deposition, *see id.* at 64, nor does he identify any now.[7]  *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1304 n.27 (D.C. Cir. 1998) (explaining burden is on employee to show some vacant position to which employer could reassign him).

As for chain regional positions, George identified an open job with responsibility for the D.C. area.  *See* George Dep. at 47.  But that job required, by George's own admission, travel to Virginia Beach, which is "four hours" away.  *See id.* at 48.  So his three-hour travel restriction precluded him from that role.  George's counter that Molson Coors lacked a "rational basis" for this denial, Opp'n at 32, rings hollow—he admitted that he could not perform the essential

---

[7]  This is a common theme of George's arguments.  He failed to submit his own Statement of Facts, choosing instead to note only where he disputes Molson Coors's Statement of Facts.  The Court then must largely accept the facts as presented by Molson Coors because George makes no effort to articulate, from his perspective, the applicable facts.  *See* LCvR 7(h)(1) (treating as admitted movant's facts that nonmovant does not dispute); *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 154 (D.C. Cir. 1996) (same).

functions.  *See Dyer v. McCormick and Schmick's Seafood Rests., Inc.*, 264 F. Supp. 3d 208, 229 (D.D.C. 2017) (finding no pretext when managers reasonably believed that employee not qualified for position).  The record thus contradicts his arguments beyond any genuine issue of material fact.  Molson Coors's failure to transfer him therefore does not show pretext.

Indeed, George's arguments about transfers and other open jobs fail to appreciate his own restrictions.  Not only could he not travel, but he refused to relocate because of his daughter.  He had good reasons for staying put, but they severely limited the number of jobs for which he was eligible in this national company.  And a refusal to relocate based on a child's educational preferences is not statutorily protected.  Given those limitations, Molson Coors's inability to find another job for him is neither surprising nor inherently suspicious.

George disagrees, mainly because he says Molson Coors failed to follow its own procedures.  According to him, Molson Coors had policies which "require[] the Company to identify accommodations" for a disabled employee, Opp'n at 17, and to consider "transfer or reassignment," *id.* at 31.

To be sure, failure to follow established policies can support an inference of pretext.  *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).  But George misstates the applicable policy.  Molson Coors's ADA accommodation policy requires the company to meet with a disabled employee and go through an Accommodations Checklist.  A human resources staffer then gathers more information about potential accommodations.  The policy requires that staffer to "also discuss with the employee any potential accommodations that the Company already has identified."  *See* Pl.'s Ex. 11 at 12, ECF No. 34 (Policy).  George reads that phrase to require Molson Coors to suggest accommodations.  The plain English says no such thing.  Under the policy, Molson Coors should discuss only those accommodations that it

"already has identified." *Id.* If the company identified none by then—or if no accommodations exist—the policy does not require Molson Coors to affirmatively mention any.

George cites another portion of the policy, but he again misreads it. Once human resources has met with the employee, Molson Coors's policy directs HR to "identify whether any known accommodations not identified by the employee are available, such as job modifications" to his current position "or alternative vacant positions." *Id.* at 14. This direction does not, as George alleges, obligate Molson Coors "to suggest open position[s]." Opp'n at 16. The policy requires that the company "identify" those possible positions—if they are available—and add that information to "the management portion of the checklist." Policy at 14. Only if the company finds other positions need it then offer one to him. *See id.* at 16. So Molson Coors's policy required it to suggest other positions to George only if it had identified appropriate ones.[8]

And although George suggests that Molson Coors never considered other positions, the Accommodations Checklist says otherwise. Recall that Molson Coors included the chain sales executive as a possible role for George but discarded it as an option because of his medical restrictions. *See* ADA Packet at 20. As the Court has just explained, the evidence shows no other available positions given George's restrictions.[9]

---

[8] In his Response to the SUMF, George invokes an alleged third provision in the policy which says that human resources would work with a disabled employee "to try to identify another vacant position." Opp'n at 18. The Court cannot find this phrase in any of the evidence, including the exhibit that George cites. *See* Opp'n, Ex. 9. Regardless, if George's recitation is accurate, his excerpt says Molson Coors will work to identify "another vacant position for which you are qualified." Opp'n at 18. Because of his travel restrictions, George has not shown that any open positions fit that description.

[9] George mostly presents these arguments as part of his failure-to-accommodate claim. *See* Opp'n at 26–31. The Court does not analyze them under that claim because, as noted above, George's inability to perform essential travel dooms it. But for the sake of completeness, the Court notes that its analysis of pretext applies to George's argument that Molson Coors failed to accommodate him by not transferring him to other roles. For the distributor jobs, George must show that a position was vacant. *See Butler*, 275 F. Supp. 3d at 85. He has failed to do so. And

In a final effort to show pretext, George focuses on the number of calls he had with Nellans about potential accommodations.  *See* Opp'n at 33.  George says that she scheduled and then cancelled three such calls.  *See id.*  So when Molson Coors fired him, he had spoken with her only once about his limitations and possible accommodations.  *See id.*  For George, this "refusal to engage" on the topic of accommodations "evinces the company's intent to terminate [him] regardless of whether his restrictions could be accommodated[.]"  *Id.*

The number of conversations standing alone, however, does not support any inference of pretext given the other evidence.  Nellans testified that during the one call where she and George discussed possible accommodations, George raised his travel restrictions.  *See* Nellans Dep. at 14.  Combined with his unwillingness to move, those restrictions precluded any other positions for him.  Nellans needed no more than one conversation to make that determination.  And recall that Molson Coors never wavered in that conclusion.  The Court finds that Molson Coors "honestly believe[d] in the reasons it offers" for George's termination, even if Molson Coors determined them after one conversation.  *Woodruff v. Peters*, 482 F.3d 521, 531 (D.C. Cir. 2007) (cleaned up).

At bottom, "[n]either the Court nor a jury is a super-personnel department."  *Harris*, 567 F. Supp. 3d at 150 (cleaned up).  And the Court cannot second-guess Molson Coors's personnel decision "absent demonstrably discriminatory motive."  *Hairston v. Vance-Cooks*, 773 F.3d 266,

---

because he admits that the regional position involved travel beyond his restrictions, he failed to show that he was qualified for it.  *See Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 60 (D.D.C. 2012).  An employer under the ADA need not reassign a disabled employee "to a position for which he is not otherwise qualified."  *Aka*, 156 F.3d at 1305.  George also argues that Molson Coors never engaged in an interactive process to identify other positions.  *See* Opp'n at 29–30.  But Molson Coors knew that his restrictions made him unqualified.  It based that conclusion on the medical information he had submitted and his own statements about his restrictions.  That Molson Coors denied his request does not mean that it failed to engage in a "flexible give-and-take."  *Ward*, 762 F.3d at 32 (cleaned up).

272 (D.C. Cir. 2014).  For all the reasons stated, George has not shown that Molson Coors's

explanation was pretextual.  Based on this record, no reasonable jury could find in his favor.  The

Court will grant summary judgment to Molson Coors on George's disability discrimination

claim.

### B. George's race discrimination claim fails for lack of evidence or pretext

For George's race discrimination claim, the Court looks to decisions interpreting Title

VII.  *See Daka, Inc. v. Breiner*, 711 A.2d 86, 94 (D.C. 1998).  George must show that he suffered

an adverse employment action because of his race.  *See Kennedy v. Berkel & Co. Contractors,*

*Inc.*, 319 F. Supp. 3d 236, 246 (D.D.C. 2018).

George presents no direct evidence of discrimination or racism.  At most, he references

"specific direct acts of discrimination," Opp'n at 34, but never identifies them.  Indeed, a lack of

evidence suffuses his entire claim.  Without more, the Court assumes that he marshals only

indirect evidence of race discrimination.  The *McDonnell Douglas* framework therefore governs.

*See Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1246 (D.C. Cir. 2011); *see also Holcomb v.*

*Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (finding *McDonnell Douglas* inapplicable when no

direct evidence of discrimination).

In his Complaint, George challenges only Molson Coors's denial of severance when it

fired him.  *See* Compl. ¶ 91.  He says that Molson Coors "regularly offered severance" to non-

black employees upon their "involuntary separate[ion]" from the company.  Opp'n at 35.

Molson Coors responds with a nondiscriminatory explanation:  Its policies do not allow it to

offer severance to employees receiving long-term disability benefits.  *See* MSJ at 36.

The record confirms that policy.  Molson Coors's "U.S. Severance Pay Plan" grants

severance to any employee who experiences "an involuntary separation . . . due to an

organizational change." *See* MSJ, Ex. 24 at 3, ECF No. 29-25.  So far so good for George.  But "[n]otwithstanding" that requirement, "Severance Pay shall not be provided to an Employee," *id.*, who "is eligible for long term disability benefits under the Company's long term disability plan," *id.*  Recall that George was not only eligible for those benefits, he received them at the time.  *See* Def.'s SUMF ¶ 34.  Molson Coors has thus adequately supported a legitimate, nondiscriminatory reason for denying him severance.  *See Figueroa*, 923 F.3d at 1087.

George argues in response that another policy applies to him.  He says that any employee terminated for "poor performance" is eligible for severance pay.  Opp'n at 35.  Molson Coors policies in the record confirm as much.  *See* Def.'s MSJ, Ex. 23 at 2–3, ECF No. 29-24.  George then contends that the company fired him for poor performance, defined as "performance not meeting expectations of the Company or general unsuitability for the position," and that he should receive severance.  *Id.* at 3.

But George conflates eligibility with entitlement.  Even assuming the company fired him for poor performance—which Molson Coors denies, *see* MSJ at 36—the policy he cites makes him only "eligible" for severance.  MSJ, Ex. 23 at 2.  The Severance Pay Plan then kicks in, denying severance to those eligible for long-term disability "[n]otwithstanding" their eligibility for severance.  MSJ, Ex. 24 at 3.  Molson Coors thus followed its policies.

George also wants to show pretext through more favorable treatment of other employees. *See, e.g.*, *Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1174 (D.C. Cir. 2021).  His Complaint lists Caucasian employees who allegedly received severance after their terminations. *See* Compl. ¶¶ 63–64.  For this treatment to support pretext, however, George must show "that all of the relevant aspects of his employment were nearly identical" to theirs.  *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (cleaned up).  As with George's

passing reference to direct discrimination, however, he gives no details about these alleged

comparators and indeed never mentions them after his Complaint.  This is not enough.  The

Court need spend no more time when George himself spends none.  *Cf. Jeffries v. Barr,* 965 F.3d

843, 860–61 (D.C. Cir. 2020) ("This Court is not in the habit of doing parties' lawyering for

them, and we decline to take up that task now.").

Finally, George alleges in his brief that Molson Coors discriminated against him through

an "inexplicably harsh" 2018 performance review.  Opp'n at 34.  According to him, that review

cost him $40,000 in bonus money.  *See id.* at 35.

Negative performance reviews that affect an employee's benefits can constitute adverse

employment actions.  *See Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003).  George has

not shown, however, that the reviews cost him $40,000.  He gives no basis for that figure, saying

only that he calculated it after accounting for Molson Coors's poor 2018 performance.  *See*

Opp'n at 10.  And at his deposition, George could not replicate the necessary math to reach

$40,000.  *See* George Dep. at 40.  The Court cannot credit such unsupported assertions.

More fatal is that George nowhere asserts that the review had anything to do with his

race.  He seems to think that the mere presence of a bad review must be evidence of racial

discrimination, but he points to nothing in the record for that assertion.  To credit this claim, the

Court needs more, particularly since George alleges now for the first time that Molson Coors

gave the negative review based on his race.  *See Brooks v. Grundmann*, 748 F.3d 1273, 1278–79

(D.C. Cir. 2014) (allowing courts to disregard a discrimination claim first raised during summary

judgment briefing when the brief "does not clearly lay out a prima facie" case).

In any event, the record shows that the negative review had nothing to do with his race.

Delaney testified that she heard negative feedback of George while she covered his role during

his medical absences.  *See* Delaney Dep. at 11–12.  Gick referenced that feedback when he gave George an unsatisfactory review.  *See* Annual Review at 8 ("I have received feedback from the field that you are sometimes aloof, not visible or not engaged.").  And such feedback—that George was aloof and disengaged—was "the feedback historically" of him by others in the company.  *See* Opp'n, Ex. 6 at 2.  The Court finds nothing in the record to show that Molson Coors acted with discriminatory intent when it gave the performance review.  By all accounts, that review reflected recent and historical feedback about George's performance on the job.

George makes two counterarguments on pretext.  *First*, he asserts that he received an award from Buffalo Wild Wings in 2019 as Vendor of the Year, implying that he must have performed better than Molson Coors claims.  *See* Opp'n at 34.  This is a thin reed for George. The record is largely silent about this award, and the available evidence, though spare, confirms that Buffalo Wild Wings gave the award to the Molson Coors *team*.  Delaney testified that she, George, and one other person received it.  *See* Opp'n, Ex. 1 at 11–12, ECF No. 32-1.  George does not say otherwise, nor does he provide any detail about the parameters of this award to show that Buffalo Wild Wings based it on his performance alone.  The Court cannot infer otherwise without more evidence.  More, a customer's perspective on one's performance may vary significantly from how the employer views him.  After all, a customer wants to save money. An employer wants to make money.  It takes a skilled salesperson to impress both parties.

*Second*, George says that Molson Coors's criticisms were "contradictory" and thus show pretext.  Opp'n at 34; *see Johnson v. Perez*, 66 F. Supp. 3d 30, 39 (D.D.C. 2014) (noting that conflicting statements can support pretext).  He questions how Molson Coors could ding him as "aloof" on one hand, Annual Review at 8, and then say he was too "aggressive and direct" on the

other, Opp'n, Ex. 9 at 5, ECF No. 32-9.  According to him, the two things cannot simultaneously be true.

The Court disagrees.  Each criticism could apply to different parts of George's job performance.  For example, George could be too disengaged as a general matter but too aggressive when he engaged interpersonally with customers.  That is exactly what the record shows.  Molson Coors's "aggressive" comment was about George's personal "style," which his supervisors thought "could turn off people." *Id.*  So Molson Coors never contradicted itself, it merely criticized two distinct parts of George's performance.  These criticisms thus cannot support an inference of pretext.

In sum, George has failed to support an inference of pretext for his race discrimination claim over either the denial of severance or the negative performance review.

### C.  George claims that Molson Coors retaliated against him for using FMLA benefits

Last is George's FMLA claim.  He says that Molson Coors retaliated against him for taking his FMLA leave.  *See* Compl. ¶¶ 98–115.  That retaliation came in the form of the negative review and George's termination.  *See* Opp'n at 37.  As with George's previous claims, the *McDonnell Douglas* framework applies.  *See* Opp'n at 35–36.

For a prima facie FMLA retaliation claim, George must show (1) that he exercised his FMLA rights; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the exercise of his rights and the adverse employment action.  *See Roseboro v. Billington*, 606 F. Supp. 2d 104, 109 (D.D.C. 2009).

### 1.  George fails to show that his performance review was pretextual

Consider first the performance review.  Molson Coors does not contest that George has stated a prima facie case for that adverse action.  And as discussed, Molson Coors based the

negative parts of that review on feedback that George's supervisors received about him.  So the Court proceeds immediately to pretext.

On this point, George argues that Gick and Delaney—despite filling out his review—were never his supervisors.  George says that he was in and out of the hospital during the time Gick allegedly supervised him.  *See* Opp'n at 8.  And as to Delaney, George says that she never supervised him.  *See id.*  It is unclear what this has to do with pretext.  As best the Court can guess, George thinks that Molson Coors's review was pretextual because Gick and Delaney were not the proper reviewers.

The record refutes his arguments.  George theorizes that Gick could not have supervised him because George was in and out of the hospital during that time.  Gick testified that George reported to him for three months in late 2018.  *See* Opp'n, Ex. 5 at 6.  And although Gick admitted that George was "in and out of the hospital for most of that time," Opp'n at 8, George was not always in the hospital.  In fact, he testified that he took "minimal" time off work during those months.  George Dep. at 46.  So the record shows that (1) George directly reported to Gick for some period before the review; and (2) during some of that time, George worked and was out of the hospital.  Thus, the record rejects George's factual characterization of Gick's role.

So too for Delaney.  George admits that when Molson Coors promoted her to national chain sales executive, she became his "supervisor."  Def.'s SUMF ¶ 10; *see also* Opp'n at 8 (not disputing this fact).  The record confirms this—the two national account executives reported directly to her.  *See* Delaney Dep. at 6–7.  Delaney hired someone for the western United States role (which she had just vacated, *see id.* at 8) and left the eastern role "open, waiting for [George] to come back," *id.* at 6–7.  George keys in on that vacancy, arguing that Delaney never supervised him because he was on leave between her promotion and the performance review.

But George has already admitted that his position reported to Delaney's, who in turn reported to Gick, *see* Gick Dep. at 10.  So Delaney technically was George's superior at the time of his review.

George next seems to allege pretext by undermining Delaney's comments about him. She testified that she heard negative feedback from George's customers while "cover[ing] his business."  Delaney Dep. at 11.  George does not dispute that she covered his job for a time. Rather, he says that Delaney failed to specify when she heard those comments.  According to him, customers might have complained to Delaney about George's nonresponsiveness during the time he "could have been on leave."  Opp'n at 37.

This is pure speculation on George's part, and he provides no citation to the record to support his assertions.  Such unfounded statements cannot create a genuine issue of material fact. *See, e.g.*, *Hutchinson v. CIA*, 393 F.3d 226, 229 (D.C. Cir. 2005).  And in any event, Delaney has averred that all feedback she received came from before George went on FMLA leave.  *See* Reply, Ex. 1 ¶ 11, ECF No. 35-1.  Based on the record, Delaney relayed feedback from before George took medical leave.

At bottom, only the temporal proximity between George's leave and his review supports pretext.  He began his leave in February 2019, and Molson Coors finished the review in March. George suggests that his reviewers essentially fabricated their negative comments to retaliate against him for recently taking FMLA leave.  But "temporal proximity alone is not enough to prove pretext."  *Crowley v. Perdue*, 318 F. Supp. 3d 277, 289 (D.D.C. 2018); *see also Woodruff*, 482 F.3d at 530.  George needs other evidence to rebut Molson Coors's legitimate proffer.  He has none.  The Court holds then that no reasonable jury could find that Molson Coors's explanations for the negative review were pretextual.

### 2.  George also fails to show that his termination was pretextual

Next, consider George's termination.  The Court has already discussed Molson Coors's legitimate reason for firing him—his inability to travel.  George again must show pretext.

He relies on two emails sent by Gick.  In April 2019, Gick emailed multiple Molson Coors employees asking "how long can [George] stay out on leave without giving up his role?  We have been without him for close to six months now and it is putting a considerable strain on the team and impacting our performance."  Opp'n Ex. 12 at 2, ECF No. 32-12.

The Court agrees with George's characterization that Gick "expressed displeasure" in this email about George's FMLA leave.  *See* Opp'n at 36.  But Gick sent that note a full seven months before Molson Coors fired George.  And Gick testified that he was not involved in the ADA process that ended in George's termination.  *See* Gick Dep. at 17–18.  So although the email shows frustration, Gick had no chance to bring that frustration to bear on Molson Coors's decision to fire George.  *See Khan v. Holder*, 37 F. Supp. 3d 213, 230 (D.D.C. 2014) (finding no pretext when the person who made inappropriate comments "was not the person who made the employment decision[ ] that adversely affected plaintiff").  Without more, an email from seven months beforehand does not undermine Molson Coors's legitimate explanation for that decision.

The second Gick email is even less germane.  In August 2019, more than three months after George had exhausted his FMLA leave, Gick emailed Nellans stating that "[George] is not guaranteed the same role if he comes back if I read the terms of the FMLA correctly."  Opp'n, Ex. 7 at 2, ECF No. 32-7.  Gick sought "a better plan" and "creative ideas" for how to deal with employees who took extended leave.  *Id.*  This email fails for the same reason as the first one— Gick had no role in the decision to terminate George.  More, when read fairly, Gick never suggested that Molson Coors should fire George because he took FMLA leave.  Gick instead

made a factual statement about his understanding of the FMLA[10] and wanted better plans for analogous situations in the future.  His email thus shows interest in the company's employment policies, not a desire to fire a particular employee for using FMLA benefits.

Beyond the two Gick emails, George cites the negative performance review as evidence of pretext.  This also fails.  The record includes no evidence that Molson Coors used or referenced the review as part of its decision to fire George, and the Court has explained why the review itself does not support pretext.  He has therefore failed to show that Molson Coors's explanation was pretextual.  The Court will grant summary judgment to Molson Coors on the FMLA retaliation claim.

## IV.  CONCLUSION

George's medical issues were severe, and the Court does not trivialize them or his difficulties.  Yet the restrictions from those issues precluded George from retaining his old job and any other job that he mentioned.  George has also failed to undermine Molson Coors's evidence that it did not discriminate in its review of him or its decision to fire him.  The Court will grant Molson Coors's motion for summary judgment.  A separate Order will issue.

Dated: July 8, 2022                                   TREVOR N. McFADDEN, U.S.D.J.

---

[10]  Incidentally, Gick was correct about how the FMLA works.  It does not guarantee employment if an employee takes all available leave and still cannot return to work.  *See Alford v. Providence Hosp.*, 945 F. Supp. 2d 98, 105 (D.D.C. 2013).  Recall that George had exhausted FMLA leave when Gick sent his email.